UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
CARLOS ABREU,                                         :

                Petitioner,           :

      -against-                           :    **REPORT AND RECOMMENDATION**

WILLIAM A. LEE,                                       :    13-CV-4697 (AT) (KNF)

                Respondent.          :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE ANALISA TORRES, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Carlos Abreu ("Abreu") filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his convictions for one count of first-degree murder, two counts of first-degree robbery, two counts of first-degree burglary, one count of second-degree criminal possession of a weapon and one count of third-degree criminal possession of a weapon. Abreu received an indeterminate sentence of 25 years to life for the first-degree murder conviction, to run consecutively with two concurrent determinate sentences of 10 years and 5 years respectively for the two weapon convictions, and a determinate sentence of 25 years for each of the first-degree robbery and first-degree burglary convictions, all to run concurrently with one another, as well as with sentences for the other counts. Abreu claims that: (1) his first-degree murder conviction was unsupported by legally sufficient evidence; (2) the trial court erred in admitting into evidence an accomplice's out-of-court statement that Abreu shot the victim; (3) the trial court erred in admitting into evidence a prior consistent statement from the cooperating witness describing what had occurred; and (4) the trial court failed to read jury notes

into the record and to provide an opportunity for him to be heard before responding to them. The respondent opposes the petition.

## BACKGROUND

On September 29, 2006, while Maria Romero ("Romero") was entering her apartment, Abreu put a gun to her head. Together with Louis Paulino ("Paulino"), Abreu forced his way inside the apartment and into the bedroom where Kenneth Ferreria[1] ("Ferreria"), who lived with Romero, was in bed. Abreu hit Ferreria on the head with his weapon and demanded money and drugs, repeatedly, while threatening to kill both Ferreria and Romero. After Abreu took cash and a number of valuables, including Ferreria's two cellular telephones, he pushed Ferreria onto a couch. Abreu aimed his gun at Ferreira and shot him in the chest, fatally. Abreu and his accomplice fled from the apartment. Police officers arrived at the scene shortly thereafter and climbed to the roof, after Romero informed them that the shooter fled that way. Police officers gave chase on the roof, from which they retrieved a black hoodie, black baseball cap and gloves.

Based on an interview with Romero, police personnel visited the home of Rafaelito Sanchez ("Sanchez"), who lived one block away from the building where the shooting occurred. An operable, unloaded .38 special five-shot revolver was recovered on the ground, below the bathroom and kitchen windows of the apartment where Sanchez lived. One of the five chambers was a lighter color, suggesting that only a single bullet was fired when it was last used. Relying on information obtained from Sanchez, the police located two suspects, Paulino and Johan

---

[1] During the trial, the victim was referred to as "Kenny Ferreria" (Tr. 3, 32, 49) and "Kenneth Ferreria" (Tr. 112). During the sentencing, the victim was referred to as "Kenny Ferrara" (Tr. 2, 12). In his appeal, the plaintiff referred to the victim as "Kenneth Ferreira" (Docket Entry No. 17-1, Exhibit G). As the correct name of the victim is unknown, the Court will refer to the victim as "Kenneth Ferreria," because Sergeant Colin Austin testified at trial that the victim was "identified as Kenneth Ferreria." (Tr. 112).

2

Cabrera ("Cabrera"). Thereafter, the police arrested Sanchez, Paulino and Cabrera.

Within days of the shooting, Detective Andrew Aguayo spoke to Abreu's girlfriend, Christine Reynoso ("Reynoso"), who put him in contact with Abreu. Abreu was interviewed by the police and provided his cellular telephone number and the first of two deoxyribonucleic acid ("DNA") samples. Abreu was arrested on February 15, 2007. He reported that he was living with Reynoso and listed her cellular telephone number as an emergency contact number.

Approximately 45 minutes before the shooting, surveillance cameras in the lobby of the building where Sanchez lived captured footage of four men leaving the building: Abreu, Paulino, Sanchez and Cabrera. All four were dressed in black hoodies and, after exiting the building, they walked in the direction of the apartment building where Ferreria lived. Approximately an hour after Ferreria was shot, a loud banging occurred on the entrance to the building where Sanchez lived. The superintended ran to the door and saw Abreu, whom he recognized as an acquaintance of Sanchez. Abreu entered the building and headed in the direction of Sanchez's apartment. Abreu was captured on the building's surveillance tape not wearing a black hoodie. Less than ten minutes later, he walked down the hallway and toward the front door of the building, dressed in differently colored clothing.

The hoodie, baseball cap and gloves found on the roof of Ferreria's building were tested. The hoodie and gloves contained blood, which matched the DNA profile obtained from Abreu's DNA sample. Cellular telephone detail records for Ferreria's stolen telephone established that within 45 minutes of the shooting, a call was placed to Reynoso's telephone number. That telephone number was the same as the one Abreu provided to the police as his emergency contact number.

A grand jury returned an indictment charging Abreu with one count of first-degree murder, two counts of second-degree murder, three counts of first-degree robbery, three counts of first-degree burglary and one count of third-degree weapon possession. Abreu proceeded to a jury trial.

Cabrera entered into a cooperation agreement with the prosecution and testified against Abreu. Before Cabrera testified, the prosecution sought permission to elicit from Cabrera that Paulino told him, after the shooting, that Abreu shot Ferreira, arguing that the statement is admissible under the co-conspirators exception to the hearsay rule. The defense objected, contending that the statement was not made in furtherance of the conspiracy. The prosecution asserted that part of the conversation during which the statement was made involved deciding where to distribute the proceeds of the robbery. The trial court acknowledged that the statement was not made in furtherance of the conspiracy, but admitted the statement into evidence because it was unaware of any requirement to excise the statement from the otherwise admissible portion of the conversation. Cabrera testified that, after the shooting, Paulino called him and asked him to meet, and when they met, told him that Abreu "had fired a shot [in]to [Ferreria]."

Cabrera testified on direct examination that he lied previously about the case and he did not tell the police the truth about everything. On cross-examination, Cabrera admitted that he had lied when he first met with the police and the prosecutor, and he continued to lie in his meetings with the prosecutor. Cabrera claimed to have stopped lying after he struck a deal with the prosecutor. Based on that testimony, on re-direct examination, the prosecutor sought to elicit Cabrera's prior consistent statements implicating Abreu. To establish that Cabrera identified Abreu and other participants well before he entered into the cooperation agreement, and that his lies concerned his own involvement, the prosecutor sought permission to play to the jury a

4

videotape of one of the proffer sessions, over an objection that prior statements are inadmissible to bolster Cabrera's testimony. The trial court determined that Cabrera was unreliable and noted that defense counsel asked Cabrera the same questions about his lies that the prosecutor asked. Nevertheless, the trial court permitted the prosecutor to conduct re-direct examination on the prior statements, including playing the videotape to the jury. The trial court admonished the jury that the videotape was not being offered for the truth of the matter asserted, but "to show what he said."

        The telephone records established that, during the home invasion, one of Ferreria's stolen cellular telephones dialed the number of Servio Bencosme ("Bencosme"), Ferreria's friend. The call went to Bencosme's voice mail, which recorded a portion of the incident. On the audio recording, the gunman demanded money and the "thing" and asked, "Do you want me to kill you?" Ferreria pleaded with the gunman to leave Romero alone, and Romero cried out in distress. Cabrera identified the voice of the gunman as belonging to Abreu. At the trial, after Cabrera completed his testimony, Abreu made threatening comments to Cabrera.

        During the jury's deliberations, the jurors sent multiple notes to the court. One of the notes requested that portions of Romero's testimony be read to the jury. The court stated that "a note was received . . . requesting readback." After receiving clarification from the jury about the portion of the testimony it wanted to hear, the court adjourned for the day telling the jurors, "we have assembled the readback." The following morning, testimony was read to the jurors. Another jury note requested that a report be sent into the jury room. The court remarked that the report was "not in evidence but we can read them testimony." The court called the jurors to the courtroom and told them that what they asked for was not in evidence, and proceeded to have testimony read to the jury. The jury convicted Abreu on all the counts of the indictment.

Abreu's conviction was affirmed on appeal. The New York Supreme Court, Appellate Division, First Department, found that: (1) Abreu's argument that his first-degree murder conviction was against the weight of the evidence was meritless; (2) the trial court "properly permitted a conspirator to testify, pursuant to the coconspirator declaration exception to the hearsay rule . . . , that a nontestifying conspirator told him that defendant shot the victim"; (3) the trial court "properly permitted the People to rebut a claim of recent fabrication by introducing a prior consistent statement made by the cooperating conspirator, since this statement predated a particular motive to falsify that had been emphasized by the defense"; (4) any error respecting an evidentiary ruling concerning the cooperating conspirator's testimony and the prior consistent statement was harmless, in light of the overwhelming evidence of guilt; (5) "the court discharged its core responsibility by providing the parties with meaningful notice of the jury notes and an opportunity to be heard"; (6) the trial "court lawfully imposed consecutive sentences for the murder and weapon possession convictions because defendant committed these offenses through separate and distinct acts"; and (7) no basis existed for reducing the sentence. People v. Abreu, 89 A.D.3d 412, 413-14, 931 N.Y.S.2d 320, 322 (App. Div. 1st Dep't 2011).

By a letter, dated November 29, 2011, Abreu sought leave to appeal to the New York Court of Appeals, asking the court to: (i) determine "whether the Appellate Division had jurisdiction to affirm the trial court's decision permitting certain hearsay on a ground different than that ruled upon by the trial court"; and (ii) make Abreu's case a companion case to People v. Ledarrius Wright, which concerned the issue of the "legality of the consecutive sentence for murder and possession of a gun used in the killing," or to hold the leave application in abeyance pending a ruling in that case. On February 2, 2012, the Court of Appeals denied leave to appeal

with leave to renew within 30 days after the court renders a decision in People v. Wright, 87 A.D.3d 229, 926 N.Y.S.2d 43 (App. Div. 1st Dep't 2011). See People v. Abreu, 18 N.Y.3d 922, 942 N.Y.S.2d 461 (2012).

By a letter, dated June 15, 2012, Abreu renewed his application for leave to appeal, contending that, "[i]n light of the decision in Wright, holding that sentences for first-degree murder and second-degree possession of a weapon must run concurrently, the Appellate Division's decision in this case upholding consecutive sentences for first-degree murder and second-degree possession of a weapon should be reviewed." On August 9, 2012, the Court of Appeals granted Abreu's application. On August 27, 2012, the Court of Appeals directed Abreu to submit "written comments and arguments in letter form in support of appellant's position on the merits." By a letter, dated September 19, 2012, Abreu argued that: (1) the consecutive sentences imposed on him for first-degree murder and second-degree gun possession "are unlawful as established . . . in People v. Ledarrius Wright, 19 N.Y.3d 359 (2012)"; and (2) "the trial court erred by admitting, over objection, two sets of hearsay statements: (i) a cooperator's testimony about what a non-testifying accomplice purportedly said to him after the incident, which was not 'in furtherance of' the conspiracy as to be admissible under the co-conspirators exception; and (ii) prior consistent statements made by the cooperator to the police implicating Mr. Abreu in the murder." On February 14, 2014, the Court of Appeals determined that: (1) because Abreu "completed the offense of second-degree weapon possession, with the requisite intent, before committing the act constituting first-degree felony murder," his "sentence[] for those crimes could be run consecutively"; and (2) "the alleged evidentiary errors could not have affected the verdict in light of the overwhelming evidence of defendant's guilt and, thus, any such error would be harmless." People v. Abreu, 20 N.Y.3d 1040, 1042, 961 N.Y.S.2d 372, 372

7

(2013). This petition followed.

***Petitioner's Contentions***

Abreu contends his claims are exhausted because he raised them in "his letter application to the New York Court of Appeals, and adequately put the state courts on notice of the federal nature of the claim[s] he advances in his habeas corpus" petition. According to Abreu, "by attaching a copy of his Appellate Division Briefs with the Appellate Division Decision upon the New York State Court of Appeals, and asking the court to review every claim was enough to put the New York State Court of Appeals on notice of his constitutional claims." According to Abreu, "there is simply no evidence of when, how, or if he reloaded the gun after it was purposefully (though perhaps not effectively) emptied of its bullets." He asserts that the "evidence shows that the conspirators remained together after the gun was purportedly emptied and given to petitioner, leaving scant opportunity for petitioner to have surreptitiously reloaded the gun," which "is not sufficient to satisfy the intent to first-degree murder conviction."

Abreu asserts that the court erred in admitting into evidence, over his objection, "Cabrera's videotaped statement – made during a pre-arrest interview several months before he entered into a cooperation agreement – to rebut the defense' allegations of recent fabrication." Abreu contends that allowing Cabrera to testify about what Paulino told him minutes after the shooting, and "the argument that proceed[ed] from it and exploited it violated petitioner's constitutional right to confront witnesses," under the Sixth and Fourteenth Amendments. Abreu maintains that Paulino's hearsay statement, that Abreu shot Ferreria, was not made in furtherance of the conspiracy, but was "merely a narrative description of what previously occurred and in no way furthered the goals of the conspiracy." According to Abreu, the prosecution first argued that Paulino's out-of-court statement to Cabrera was admissible because

8

it occurred while the two conspirators discussed distributing the proceeds of the robbery. However, he contends, after having admitted that no such discussion took place, the prosecution argued that the conversation was in furtherance of the conspiracy because it "was a step toward" splitting up the proceeds. Abreu asserts that the prosecution appeared to contend "that although the splitting up of the proceeds was not discussed at that time, the conversation occurred after the robbery and before the distribution of proceeds so as to be some unspecified 'step' in the process." Abreu maintains that a "post-event description by one conspirator to another of what had previously occurred amounts to 'mere[] narrative' and 'idle chatter' that is not admissible under the co-conspirator's exception." According to Abreu, since Cabrera's statement went directly to the key element of the first-degree murder, namely "whether the killing was personally committed by petitioner without resort to accomplice liability," and "the other evidence was not conclusive," the court's error in admitting that statement was not harmless.

Abreu asserts that the trial court erred in allowing Cabrera's prior consistent videotaped statement into evidence. He maintains that "the prosecutor was the first person to call Cabrera a liar, forcing him to admit that he did not 'tell the police the truth about everything.'" Abreu contends that his counsel, in the opening statement and through cross-examination, did nothing more than the prosecution did on its direct, as the court acknowledged. According to Abreu, the prosecutor's argument that Cabrera's prior consistent statement was admissible because the defense was suggesting a recent fabrication is erroneous because the "defense did the opposite," arguing that "Cabrera was lying, including when he first spoke with the police and the Assistant District Attorney," to exculpate himself. The defense counsel's questions to Cabrera were designed, "not to claim that Cabrera had recently fabricated his tale, but rather to claim that Cabrera had been lying since the beginning."

9

Abreu asserts that the trial court erred by failing to read the jury notes into the record and to provide him with an opportunity to be heard prior to responding to them. Abreu maintains that the jury's note requested that portions of Romero's testimony be read to it, but the trial court did not read that note into the record, merely remarking that "a note was received . . . requesting readback." The trial was adjourned for the day without providing a response, "but [the court] remarked to the jurors that the readback had been assembled." Abreu asserts that, the following morning, "some unidentified testimony was read back to the jurors," without consulting the attorneys. The subsequent jury note requested that a report that was not in evidence be sent into the jury room. The court commented that the item "is not in evidence but we can read them the testimony," without consulting with counsel. The court advised the jurors that "what they 'asked for is not in evidence,'" and provided "a read back of some unspecified testimony that had not been requested." Abreu contends that the trial court failed to respond to the jury notes in the manner required by New York Criminal Procedure Law § 330.10. Abreu contends he is entitled to an evidentiary hearing.

*Respondent's Contentions*

The respondent contends that the claim of insufficient evidence is unexhausted, procedurally defaulted and meritless. According to the respondent, Abreu never raised this claim in the state court and the time to do so has expired, making that claim procedurally defaulted. The respondent asserts that, even if Abreu can overcome the procedural bar, this claim has no merit because ample evidence established that Ferreria's murder occurred in the course of and in furtherance of first-degree burglary and first-degree robbery, and overwhelming evidence was presented of Abreu's identity as the gunman, including DNA evidence, the surveillance video taken one block from Sanchez's apartment building, Cabrera's testimony, and

10

a telephone call placed from Ferreria's telephone to Reynoso after the shooting. Moreover, much of the same evidence established that Abreu intended to kill Ferreria, including Romero's testimony that the gunman pointed the gun directly at Ferreria and shot him in the chest while Ferreria was sitting down, unarmed and defenseless. The respondent asserts that the evidence compelled the inference that, after the cohorts unloaded the revolver, Abreu reloaded it.

The respondent contends that Abreu's federal challenges to the evidentiary rulings are unexhausted, procedurally defaulted and meritless. The respondent maintains that Paulino's out-of-court declaration cannot support a Confrontation Clause claim, since it was not testimonial. Moreover, Cabrera's prior consistent statement did not violate the Confrontation Clause because Cabrera testified at the trial and the evidence was not admitted for the truth of the matter asserted. The respondent asserts that Abreu's state-evidentiary claims are not cognizable in this proceeding. Moreover, Abreu cannot establish that these allegedly erroneous rulings caused him prejudice.

The respondent contends that Abreu failed to exhaust his federal claim, that the trial court mishandled jury notes, and that claim is meritless because "no Supreme Court decision clearly establishes a constitutional right to have the trial court afford the defense notice of a jury inquiry and opportunity for input prior to responding to the inquiry in open court." Furthermore, "the record overwhelmingly supports the conclusion that petitioner was given sufficient notice of the disputed notes and the opportunity to comment about how the court should respond to them, and also that the court answered the jurors' inquiries in open court in the presence of defendant and his counsel." The respondent contends that, even if the trial court erred in handling the jury notes, Abreu cannot show that he was prejudiced by it.

**DISCUSSION**

*Legal Standard*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision is contrary to clearly established Supreme Court precedent if its conclusion on a question of law is "opposite to that reached by [the Supreme] Court," or if the state court reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). A state-court decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08, 120 S. Ct. at 1520. In the AEDPA "context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" Howes v. Fields, __ U.S. __, 132 S. Ct. 1181, 1187 (2012). "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, __ U.S.__, 134 S. Ct. 1697, 1706-07 (2014) (citation omitted). On a petition for a writ of federal habeas corpus, "[t]he petitioner carries the burden of proof." Cullen v.

Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398 (2011). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

AEDPA requires a petitioner to exhaust all remedies available in the state courts. See 28 U.S.C. § 2254(b)(1)(A). This means that the petitioner must "'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'" Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (citation omitted). Although the petitioner is not required to make citation to the Constitution to satisfy this requirement, "he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" Id. (citation omitted).

When a claim has not been presented to a state court for adjudication, a federal court reviewing a habeas corpus petition may deem the claim exhausted "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). A procedurally defaulted claim may be reviewed by a federal court only if the petitioner shows "cause for the default and prejudice, or demonstrate[s] that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." Id. To establish cause for a procedural default, a petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986).

13

*Application of Legal Standard*

<u>Claim 1: Insufficient Evidence and Claim 4: Mishandling of the Jury Notes</u>

Abreu did not raise, before the New York Court of Appeals, his claims that: (a) evidence was legally insufficient to establish his first-degree murder conviction; and (b) the trial court mishandled the jury notes. Abreu's claims may be deemed exhausted because they were not presented to the highest state court capable of reviewing them, and their presentation to that court is procedurally barred and would be futile. <u>See</u> <u>Aparicio</u>, 269 F.3d at 90. Abreu failed to show that some objective factor external to his defense impeded his compliance with the state procedural rules. Moreover, he does not claim he is actually innocent. In the absence of Abreu showing cause for his procedural default and resulting prejudice that would attend him, or that he is actually innocent, Abreu's claims cannot be reviewed.

<u>Claim 2: Right to Confront Witnesses</u>

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986)(citations omitted). The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365 (2004). "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of

14

evidence, not the Confrontation Clause.'" Williams v. Illinois, __ U.S. __, 132 S. Ct. 2221, 2243 (2012) (citation omitted). Whether evidence is "incorrectly admitted" or omitted "is no part of a federal court's habeas review of a state conviction," because "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) (citation omitted). In conducting federal habeas review, a court is limited to deciding "whether the admission [or omission] of the evidence violated [the petitioner's] federal constitutional rights." Id. at 68, 112 S. Ct. at 480. Thus, federal habeas relief may be warranted only where the evidentiary ruling "so infused the trial with unfairness as to deny due process of law." Id. at 75, 112 S. Ct. at 484 (quoting Lisenba v. California, 314 U.S. 219, 228, 62 S. Ct. 280, 286 (1941)).

Paulino's out-of-court statement to Cabrera, that Abreu shot Ferreria, is not testimonial, because it was not made for the primary purpose of creating an out-of-court substitute for trial testimony. Accordingly, it is not subject to Confrontation Clause protection. See Williams, __ U.S. __, 132 S. Ct. at 2243. Upon review of the state-court record, the Court finds that the trial court's admission of Paulino's statement is not a ruling that "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75, 112 S. Ct. at 484. Accordingly, no habeas corpus relief is warranted on this claim.

Claim 3: Improper Admission of Prior Consistent Statement

To the extent that Abreu's claim, that the trial court admitted Cabrera's prior consistent statement erroneously, is based on state law, it is not subject to federal habeas corpus review. See Estelle, 502 U.S. at 67, 112 S. Ct. at 480.

Here, Cabrera, the declarant in a videotaped statement given to the prosecutor during a proffer session, testified at trial and was subject to cross-examination by defense counsel.

Cabrera's statement to the prosecutor during a proffer session is not testimonial because it was not made for the primary purpose of creating an out-of-court substitute for trial testimony. Accordingly, it is not subject to Confrontation Clause protection. See Williams, __ U.S. __, 132 S. Ct. at 2243. The court instructed the jury properly that Cabrera's videotaped statement cannot be considered for the truth of the matter asserted in it. Upon review of the state-court record, the Court finds that the trial court's admission of Cabrera's prior consistent statement is not a ruling that "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75, 112 S. Ct. at 484. Thus, no habeas corpus relief is warranted on this claim.

## RECOMMENDATION

For the foregoing reasons, I recommend that the petition be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, 500 Pearl Street, Room 2210, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Torres. ***Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude***

***appellate review.*** See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
      March 16, 2015

Copy mailed to:

Carlos Abreu

Respectfully submitted,

*/s/ Kevin Nathaniel Fox*
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

17